IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**MARY A. BURNS,**

     **Plaintiff,**

     **v.**                                       **CASE NO. 2:13-cv-25614**

**CAROLYN W. COLVIN,**
     **Acting Commissioner of Social Security,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before this Court is Plaintiff's Motion for Summary Judgment (ECF No. 13) and Brief in Support of Defendant's Decision (ECF No. 17).

Background

Mary Ann Burns, Claimant, protectively applied a Title II application for disability and disability insurance benefits (DIB) on May 17, 2010, alleging disability on August 9, 2009 (ECF No. 143-144). The claim was denied initially on January 18, 2011 (Tr. at 78-82) and again upon reconsideration on June 14, 2011 (Tr. at 84-87). Claimant filed a written request for hearing on July 13, 2011(Tr. at 91-92). In her request for a hearing before an Administrative Law Judge (ALJ), Claimant stated that she disagreed with the determination made on her claim because all of the evidence had not been fairly considered and fully evaluated (Tr. at 91). Claimant appeared in person and testified at a hearing held in Charleston, West Virginia on June 13, 2012 (Tr. at 34-73). In the Decision dated June 21, 2012, the ALJ determined that Claimant was not disabled under the Social Security Act (Tr. at 12-27). On August 20, 2012, Claimant requested a review by the Appeals Council because all the evidence had not been fairly considered and fully evaluated (Tr. at 7). On August 21, 2013, the Appeals Council received additional evidence

from Claimant which was made part of the record (Tr. at 5).   That evidence consisted of Representative Brief dated August 8, 2012, admitted as Exhibit 27E.   On August 21, 2013, the Appeals Council "found no reason under our rules to review the Administrative Law Judge's decision" (Tr. at 1).   The Appeals Council stated that it considered Claimant's reasons for disagreement with the decision and the additional evidence which was made part of the record. The Appeals Council found that this information did not provide a basis for changing the ALJ's decision (Tr. at 1-3).

On March 24, 2014, Claimant brought the present action requesting this Court to reverse the Commissioner's previous denial or, in the alternative, remand this case for another administrative hearing.

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).   A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.   20 C.F.R. §§ 404.1520, 416.920 (2013).   If an individual is found "not disabled" at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a), 416.920(a).   The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  *Id.* §§ 404.1520(b), 416.920(b).   If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  *Id.* §§ 404.1520(c), 416.920(c).   If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   *Id.* §§

404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  *Id.*  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  *Id.* §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.  *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2013).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date through her date last insured (Tr. at 14).  Under the second inquiry, the ALJ found that as of March 31, 2012, the date last insured, Claimant suffers from the severe impairments of degenerative disk disease, depression and anxiety.  (*Id.*)  At the third inquiry, the ALJ concluded that Claimant does not have an impairment or combination of impairments that meets or equals the level of severity of any listing in Appendix 1 (Tr. at 16-17).  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations[1]. Transferability of job skills is not material to the determination of disability because Claimant

---

[1] The ALJ held that Claimant can occasionally climb ramps, stairs, ladders, ropes and scaffolds.  She can occasionally balance, stoop, kneel, crouch or crawl.  She must avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gas, poor ventilation and hazards such as moving machinery and unprotected heights.  She is also limited to jobs that involve only occasional interaction with the public (Tr. at 18).

has been found to be "not disabled" (Tr. at 26).   As a result, Claimant can perform occupations

such as office helper, non-postal mail sorter and assembly worker (Tr. at 26-27).   On this basis,

benefits were denied (Tr. at 27).

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner

denying the claim is supported by substantial evidence.   In *Blalock v. Richardson*, substantial

evidence was defined as:

> "evidence which a reasoning mind would accept as sufficient to support a
> particular conclusion. It consists of more than a mere scintilla of evidence but
> may be somewhat less than a preponderance. If there is evidence to justify a
> refusal to direct a verdict were the case before a jury, then there is 'substantial
> evidence.'"

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebreze*, 368 F.2d

640, 642 (4th Cir. 1966)).   Additionally, the Commissioner, not the court, is charged with

resolving conflicts in the evidence.   *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their

duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational."   *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by

substantial evidence.

Claimant's Background

Claimant was born on September 19, 1971.   She has a high school education (Tr. at 26,

342).   Claimant asserts that she received vocational training as a clinical medical assistant and is

currently working on obtaining her Masters degree in psychology at Mountain State University

through online courses (Tr. at 342).   Claimant alleges disability beginning August 9, 2009.

4

Claimant was last employed in April 2009 as an office manager for Frazer Creek Mining, which is part of Trinity Coal Company (Tr. at 341). Claimant reported that she stopped working in April 2009 when the coal mine shut down, but that by August 2009, she realized she could no longer work (Tr. at 59, 172, 256). She reports her longest period of employment was 29 months as a coal miner. Claimant briefly worked in 2010, but claimed that she was unable to sustain employment due to her physical condition (Tr. at 59-60, 154, 168, 261). Claimant reported that she was disabled due to degenerative disk disease in her lumbar and cervical spine, hypothyroidism, carpal tunnel syndrome, depression and anxiety (Tr. at 172, 178, 214). Claimant reported that she began receiving mental health treatment as a teenager. (*Id.*)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's Decision is not based upon substantial evidence (ECF No. 14). First, Claimant asserts that the Administrative Law Judge (ALJ) failed to give significant weight to the opinion of a treating psychiatrist pursuant to the "treating physician's rule." Claimant asserts that such failure involves the ALJ ignoring the diagnosis by her treating psychiatrist of severe mental illness; lumbosacral disk degeneration and cervical disk degeneration; and carpal tunnel syndrome. Second, Claimant asserts that the ALJ overestimated the treating psychiatrist's physical residual functional capabilities (RFC) in finding that she can perform a full range of light and/or sedentary work. Claimant asserts that she cannot perform this range of work as a result of manipulative limitations from bilateral carpal tunnel syndrome. As a result of the ALJ's failure to give significant weight to the opinion of Claimant's psychiatrist, Claimant asserts the ALJ presented an improper hypothetical to the vocational expert at the hearing. In response, Defendant asserts that the ALJ appropriately evaluated the

opinions of Claimant's physicians and relied upon a hypothetical question that adequately reflected Claimant's residual functional capacity (ECF No. 17).

Medical Record

Claimant complained of lower back pain to Serafino S. Maducdoc, Jr., M.D., in September 2009 (Tr. at 527).   In January 2010, Claimant underwent treatment with a chiropractor for low back pain (Tr. at 271-277).  On March 14, 2010, Claimant underwent an MRI of her lumber spine, revealing mild degenerative disk disease and moderate facet arthropathy, most pronounced at L4-5, where there was a moderate degree of right-sided foraminal stenosis (Tr. at 374-375).

On March 18, 2010, Martin Greenberg, M.D., a neurosurgeon, examined Claimant and diagnosed her with lumbar disk disease with several years progressive history of low back pain (Tr. at 278-279).  Dr. Greenberg stated that Claimant was neurologically intact (Tr. at 279).  He advised that Claimant continue chiropractic manipulation, recommended physical therapy, use of a treadmill and prescribed various medications, including Soma, a muscle relaxant.   Dr. Greenberg also diagnosed Claimant with cervical disk disease C5-6, C6-7, probably nonsurgical, neurologically intact and recommended conservative medical treatment.  (*Id.*) Thereafter, Claimant underwent intermittent physical therapy treatments for cervical and lumbar degenerative disk disease from April 2010 through July 2010 (Tr. at 280-300).

On May 28, 2010, Claimant underwent an MRI of her cervical spine, revealing a bulging disk and osteophyte formation with associated neural foraminal encroachment at C4-5, C5-6 and C6-7 (Tr. at 376).  There was no herniation at any level (Tr. at 376).  There was also a complex mass involving the left lobe of Claimant's thyroid (Tr. at 376).  Dr. Maducdoc referred Claimant

to Barry K. Vaught, M.D., a neurosurgeon, and Scott M. Killmer, M.D., a general surgeon, for further evaluation and treatment (Tr. at 585).

Claimant had a history of treatment for anxiety and depression since May 2010 from Omar K. Hasan, M.D., a psychiatrist (Tr. at 601).  Dr. Hasan noted Claimant's complaints of increased anxiety, decreased mood and irritability (Tr. at 601).  He diagnosed major depression disorder and anxiety disorder, not otherwise specified and prescribed medications, including Cymbalta, Geodon and Ativan for treatment (Tr. at 601, 616).  Treatment notes through 2010 with Dr. Hasan essentially indicated that Claimant had stable mood with no medication side effects (Tr. at 600-601, 604-605, 616-617).  Claimant's main complaint had to do with poor sleep consistent with obstructive apnea (Tr. at 604-605, 617, 620-622).

On August 11, 2010, Dr. Killmer evaluated Claimant regarding her thyroid nodule (Tr. at 387-390).  Claimant denied any back or joint pain or any tingling or numbness (Tr. at 388, 398).  Claimant ambulated without difficulty (Tr. at 388).  Her neck was normal without tenderness on palpation and her thyroid was normal in size without tenderness, nodules or masses (Tr. at 389).  Claimant's musculoskeletal examination was also normal (Tr. at 389).  A radionuclide thyroid scan revealed a warm nodule (Tr. at 390, 396-397).

On August 17, 2010, Dr. Vaught evaluated Claimant regarding her complaints of neck and low back pain (Tr. at 319-320).  Claimant reported that her pain began a year earlier in 2009 when she went to the gym (Tr. at 319).  She later went to Disneyland in August 2009 (same month of alleged onset date of disability), but claimed that the walking around made her symptoms worse (Tr. at 319).  Claimant had 5/5 motor strength in her upper and lower extremities, 2+ and symmetric reflexes, intact coordination, intact sensation to light touch, some mild distal vibratory sensation loss and multiple tender points over her shoulders, arms and legs

(Tr. at 320).  An EMG and nerve conduction study of Claimant's upper extremities showed bilateral carpal tunnel syndrome, which Dr. Vaught opined might explain the tingling in Claimant's hands, but not much else (Tr. at 310-311, 320).  On September 1, 2010, Claimant underwent an EMG and nerve conduction study of her lower extremities, which showed no evidence for right lumbosacral radiculopathy or peripheral polyneuropathy (Tr. at 305-306).  Dr. Vaught suspected that Claimant had fibromyalgia (Tr. at 320).

On August 25, 2010, Claimant reported to Dr. Killmer that she was busy due to her work and school schedule (Tr. at 390).  Dr. Killmer recommended total thyroidectomy, which was performed on September 21, 2010 (Tr. at 406, 408, 675).  The subsequent pathology showed papillary thyroid carcinoma (thyroid gland cancer) (Tr. at 411).

On October 29, 2010, Nilima R. Bhirud, M.D., performed a consultative physical examination of Claimant (Tr. at 347-353).  Dr. Bhirud noted that Claimant could pick up a coin from the floor, stand on one foot at a time, do heel and toe walking, squat and walk in tandem gait (Tr. at 350).  Her gait was normal and she did not use an ambulatory aid (Tr. at 350).  She was comfortable in sitting and standing positions (Tr. at 350).  Forward flexion of her lumbar spine was 90 degrees (Tr. at 350).  Lungs, cardiovascular, central nervous system and extremities examinations showed normal findings and Claimant's abdomen was soft and non-tender (Tr. at 351).  On the musculoskeletal examination, Claimant's cervical and thoracic spine revealed no tenderness (Tr. at 351).  Cervical spine range of motion was normal (Tr. at 351).  There was mild tenderness of Claimant's lumbar spine and straight leg raising was positive at 70 degrees on both sides (Tr. at 351).  There was no swelling or tenderness in Claimant's right or left hands (Tr. at 351).  The joints of her hands were also normal, as was her grip strength (Tr. at 351).  There was also no swelling of Claimant's knees or ankles and range of motion was normal (Tr. at 351).

8

On October 13, 2010, Kara Gettman-Hughes, M.A., performed a consultative psychological evaluation of Claimant (Tr. at 340-345). Ms. Gettman-Hughes noted that Claimant had driven alone to the examination[2] (Tr. at 340). Claimant stated that she was currently working on obtaining her Master's degree in psychology by taking online classes (Tr. at 342). Claimant's daily routine consisted of sitting at a desk and doing her homework (Tr. at 344). Claimant's mood was anxious and her affect was blunted (Tr. at 342). Her immediate and recent memory was within normal limits and her remote memory was good (Tr. at 342-343). Her concentration was intact and her persistence and pace were normal. Her social functioning was mildly impaired. Ms. Gettman-Hughes diagnosed generalized anxiety disorder, panic disorder with agoraphobia and depressive disorder, not otherwise specified (Tr. at 342).

On October 29, 2010, Claimant was sent by the Social Security Administration for physical evaluation by Nilma Bhirud, M.D. On physical examination, Dr. Bhirud also documents that Claimant was positive bilaterally for straight leg raise tests at seventy (70) degrees (Tr. at 348).

On November 3, 2010, G. David Allen, Ph.D., a State agency psychological consultant, reviewed the evidence at the initial level and opined that Claimant's mental impairments were not disabling and that she retained the capacity to perform work-related activities, as long as the activity did not involve exposure to crowds (Tr. at 355, 370-372). On June 13, 2011, Timothy Saar, Ph.D., a State agency psychological consultant, reviewed the record at the reconsideration level and affirmed Dr. Allen's opinion (Tr. at 508).

On November 10, 2010, Raghda Sahloul, M.D., an endocrinologist, evaluated Claimant for treatment of thyroid cancer and post-surgical hypothyroidism (Tr. at 803-805). Dr. Sahloul

---

[2] Claimant drove herself approximately 50 miles one way to the examination.

recommended radioactive iodine ablation, which Claimant underwent on November 7, 2010 (Tr. 812-813).   By April 2011, Claimant's thyroid stimulating hormone (TSH) returned back to normal with the use of Synthroid, a thyroid hormone (Tr. at 799-800, 806-807).

On January 13, 2011, A. Rafael Gomez, M.D., a State agency medical consultant, reviewed the evidence and opined that Claimant was capable of light work (Tr. at 453-458).  Dr. Gomez further opined that Claimant could perform all postural activities occasionally, including stooping, had no manipulative limitations and should avoid concentrated exposure to vibration and hazards (Tr. at 455-457).  On May 27, 2011, Subhash Gajendragadkar, M.D., a State agency medical consultant, reviewed the record at the reconsideration level and also opined that Claimant was capable of light work (Tr. at 498-506).  Dr. Gajendragadkar opined, however, that Claimant should avoid repetitive movements of both hands and wrists due to bilateral carpal tunnel syndrome (Tr. at 499).  He identified no specific manipulative limitations (Tr. at 501).

On June 11, 2011, Dr. Hasan authored a treating physician letter detailing Claimant's condition from a mental standpoint.  Dr. Hasan opined:

> Ms. Mary Burns has been under the care of Raleigh Psychiatric Services since 03/16/2010 for treatment of Major depressive Disorder and Adjustment Disorder with Mixed Anxiety and Depression.  She has been compliant with treatment and taking her medication regularly.  She has seen some improvement in her psychiatric sympathology (sic) with treatment; however, she continues to have significant symptoms to impair her ability to function daily, which impairs her ability to pursue any type of gainful employment for now and in the foreseeable future.

On August 8, 2011, Dr. Maducdoc completed a medical source statement assessing Claimant's physical ability to do work-related activities (Tr. at 591-594).  Dr. Maducdoc opined that Claimant could lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, could stand and/or walk at least 2 hours in an 8-hour workday, was limited in pushing and/or

pulling with her lower extremities and was limited to occasional postural activities (Tr. at 591-592).  Dr. Maducdoc attributed Claimant's limitations to constant pain in her lower back (Tr. at 592).  He opined that Claimant's ability to sit was unaffected by her impairments, as was her ability to perform manipulative functions, such as reaching, handling and fingering (Tr. at 592-593).

On August 9, 2011, Claimant returned to Dr. Hasan and reported that she went to Florida on vacation and was considering moving there (Tr. at 950).  Claimant did not report any mental symptoms (Tr. at 950).  Dr. Hasan discontinued Cymbalta and Geodon and added Abilify to Claimant's medications (Tr. at 950).  Dr. Hasan completed a medical source statement assessing Claimant's mental ability to do work-related activities (Tr. at 607-609).  Dr. Hasan opined that Claimant had a poor ability to deal with the public; use judgment; deal with work stresses; understand, remember and carry out detailed instructions; and behave in an emotionally stable manner (Tr. at 607-608).  He further opined that Claimant had a fair ability to follow work rules; relate to co-workers; interact with supervisors; function independently; maintain attention and concentration; understand, remember and carry out complex and simple job instructions; maintain personal appearance; relate predictably in social situation; and demonstrate reliability.

On August 31, 2011, Claimant reported that she was doing fair and taking medication as prescribed without any side effects.  Claimant's mood was anxious and her affect was labile (Tr. at 829).  Her thoughts were goal directed.  There was no evidence of hallucinations, delusions, suicidal or homicidal intent. (*Id.*)  She was oriented, her memory was intact and her insight and judgment were fair.  On October 31, 2011, Claimant reported that she was eating and sleeping poorly, very depressed and irritable (Tr. at 951).  Her mood was euthymic and her affect was

11

broad.  The diagnosis was major depression, recurrent, in partial remission, and generalized anxiety disorder. (*Id.*)

On October 5, 2011, and October 26, 2011, Claimant complained of back and neck pain to Dr. Maducdoc (Tr. at 832, 949).  An MRI of Claimant's lumbar spine on October 6, 2011, with and without contrast, showed similar findings to the previous MRI of 2010 with no evidence of disk herniation at any level or any evidence of high-grade stenosis (Tr. at 833).  There was multi-level disk bulging most notably at L2-3 and L4-5 with mild neural foraminal encroachment (Tr. at 833).  There was no evidence of abnormal enhancement to suggest inflammatory or neoplastic process (Tr. 831, 833-834).  An MRI of Claimant's cervical spine showed multilevel disk bulging and osteophyte formation with mild neural foraminal encroachment related to bulging disk and hypertrophic facet joint changes at C4-5, C5-6 and C6-7 (Tr. at 835).  There was no disk herniation at any level, no spinal cord signal abnormality and no inflammatory or neoplastic process.  There was a complex cystic and solid mass involving the left lobe of the thyroid most likely benign in nature (Tr. at 836).  Claimant again treated with Dr. Hasan on October 31, 2011 (R. 951).  At this point it was noted that Claimant was "very depressed," her symptoms were "unstable" and that her "eating and sleeping were poor."  (*Id.*)  Dr. Hasan reported that Claimant was not suicidal, homicidal or psychotic and did not warrant inpatient psychiatric admission.  Her memory was intact, her insight and judgment were good and her thoughts were logical.  (*Id.*)

Claimant returned to Dr. Killmer on November 7, 2011, to evaluate the thyroid mass (Tr. at 956-957).  An ultrasound of Claimant's thyroid showed questionable left thyroid tissue (Tr. at 960).  The CT of Claimant's neck, however, showed no finding of an abnormal neck mass or lymphadenopathy (Tr. at 958-959).

On November 28, 2011, Rajesh V. Patel, M.D., evaluated Claimant (Tr. at 961-965). Claimant complained of moderate discomfort primarily in her neck and lower back since 2009 and numbness sometimes in her arms and legs (Tr. at 961).  Dr. Patel reviewed MRI reports of Claimant's lumbar and cervical spines (Tr. at 965).  Claimant had limited range of motion of her cervical and lumbar spines, intact sensation to light touch, positive Tinel's and Phalen's signs, normal motor strength, no muscle atrophy, normal gait and positive straight leg raising (Tr. at 961-964).  Dr. Patel diagnosed cervical degenerative disk disease, lumbar degenerative disk disease, cervical spondylosis, lumbar disk bulging, cervical neural foraminal stenosis and rule out carpal tunnel syndrome (Tr. at 965).  Dr. Patel noted that the MRI report did not reveal any significant nerve root impingement and recommended an EMG study of Claimant's upper and lower extremities (Tr. at 965).  He also recommended that Claimant resume physical therapy since it had given her relief in the past (Tr. at 961, 965).

Claimant did not return until February 7, 2012 (Tr. at 968).  She advised Dr. Hasan that she had spent a few months in Florida (Tr. at 968).  She stated that her mood was improved and she felt better (Tr. at 968).  She reported that she has been back for about a month and has been out of medicine for a few months.  (*Id.*)  On the mental status examination, Claimant's mood was euthymic and her affect was broad.  Her thoughts were logical, memory was intact and insight and judgment were good. (*Id.*)  Dr. Hasan diagnosed major depressive disorder, recurrent, partial remission, and generalized anxiety disorder.  He restarted Claimant's medication as they "helped [her] symptoms in the past."  On a follow-up examination on March 12, 2012, Claimant reported that her symptoms were stable and denied any problems (Tr. at 971). Her mood was euthymic and her affect was broad.  On June 11, 2012, Dr. Hasan reported in a letter that Claimant had some improvement with medications, but still had significant psychiatric symptoms that

13

impaired her ability to function daily or her ability "to pursue any type of gainful employment for now and in the foreseeable future" (Tr. at 972).

Standard of Review

The role of this Court, on judicial review, is to determine whether the Commissioner's final decision is supported by substantial evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* In applying the substantial evidence standard, the Court should not "reweigh conflicting evidence, making credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F. 3d 585, 589 (4th Cir. 1996)). "When conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Id.*

Discussion

Evaluating a claimant's mental impairments

When evaluating a claimant's mental impairments, the Social Security Administration uses a special sequential analysis outlined at 20 C.F.R. §§ 404.1520a and 416.920a (2013). First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment. §§ 404.1520a(b)(1) and 416.920a(b)(1). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). §§ 404.1520a(b)(1) and (e), 416.920a(b)(1) and (e). Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). §§ 404.1520a(b)(2) and 416.920a(b)(2). Functional limitation is rated with respect to four broad areas (activities of daily living, social

functioning, concentration, persistence or pace, and episodes of decompensation).  §§ 404.1520a(c)(3) and 416.920a(c)(3).  The first three areas are rated on a five-point scale: None, mild, moderate, marked, and extreme.  The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4) and 416.920a(c)(4).  A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise.  §§ 404.1520a(d)(1) and 416.920a(d)(1).  Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2).  Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity.  §§ 404.1520a(d)(3) and 416.920a(d)(3).  The ALJ incorporates the findings derived from the analysis:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.
> § 416.920a(e)(2).

Claimant asserts that the ALJ failed to find that she suffers from severe mental illness, particularly depression, anxiety and panic with agoraphobia.  Claimant asserts that Dr. Hasan diagnosed her with major depression and anxiety.  Claimant's alleged mental illnesses contain the following criteria under  Appendix 1 to Subpart P of Part 404, Listing of Impairments:

Listing 12.04
Section 12.04 requires the following:
12.04 *Affective Disorders*: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged

emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the following requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
a.  Anhedonia or pervasive loss of interest in almost all activities; or
b.  Appetite disturbance with change in weight; or
c.  Sleep disturbance; or
d.  Psychomotor agitation or retardation; or
e.  Decreased energy; or
f.  Feelings of guilt or worthlessness; or
g.  Difficulty concentrating or thinking; or
h.  Thoughts of suicide; or
i.  Hallucinations, delusions, or paranoid thinking;

* * *
AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence or pace; or
4.  Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support, and one of the following:
1.  Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2013).


<u>Listing 12.06</u>
Section 12.06 requires the following:

16

12.06 *Anxiety Related Disorders*: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the following requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented findings of at least one of the following:

1.  Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a.  Motor tension; or

b.  Autonomic hyperactivity; or

c.  Apprehensive expectation; or

d.  Vigilance and scanning;

or

2.  A persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation; or

3.  Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.  Recurrent obsessions or compulsions which are a source of marked distress; or

5.  Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 (2013).


The ALJ held that Claimant has mild restriction in activities of daily living (Tr. at 17).

Claimant self-reported to preparing simple meals, hanging clothes, doing laundry, performing

physical therapy, partaking in aquatic exercise and walking to the end of the driveway to get the newspaper.  The ALJ held that "These self-reported activities of daily living are inconsistent with an individual who cannot perform work within the established residual functional capacity." (*Id.*)  Further, the ALJ states that "At the hearing, the claimant minimized her activities of daily living but the record provides no such basis for such decreased activities of daily living" (Tr. at 24).

The ALJ found Claimant to have moderate difficulties in social functioning.  (*Id.*)  The ALJ stated that Claimant shops in stores and by telephone.  He held that Claimant goes to the post office daily.  Claimant self-reported that she travels by walking or driving a car and is able to go out alone.  With regard to concentration, persistence or pace, the ALJ found that Claimant had mild difficulties.  Claimant is able to pay bills, count change, handle a savings account and use a checkbook/money order (Tr. at 17-18).  The ALJ noted that Claimant enjoys reading, watching television and surfing the internet on a daily basis (Tr. at 18).  The ALJ held that Claimant has not experienced any episodes of decompensation.  Because Claimant's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, Claimant did not meet or medically equal the criteria of listings 12.04 and 12.06.

Further, the ALJ considered whether Claimant satisfied the criteria for "paragraph C" for listings 12.04 and 12.06 and held that she did not because there is no medically documented history of chronic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities (Tr. at 18).   The ALJ held that there is no residual disease process that has resulted in such a marginal adjustment that even minimal increase in mental demands or changes in the environment would be predicted to cause the

18

individual to decompensate.  Additionally, there is no evidence of a chronic mental disorder resulting in inability to function independently outside the area of one's home.

Weight Afforded Examining Physician Opinion

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. § 416.927(d)(2) (2013).  Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 416.927(d)(2) (2005). Under § 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.   Sections 416.927(d)(3), (4), and (5) add the factors of supportability, consistency and specialization. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." § 416.927(d)(2).

Under § 416.927(d)(1), more weight generally is given to an examiner than to a non-examiner.  Section 416.927(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." *Martin v. Secretary of Health, Education and Welfare*, 492 F.2d 905, 908 (4th Cir. 1974); *Hayes v. Gardener*, 376 F.2d 517, 520-21 (4th Cir. 1967).  Thus, the

opinion "of a non-examining physician can be relied upon when it is consistent with the record."

*Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).

Claimant argues that the ALJ failed to properly weigh the opinions of treating physicians,

Dr. Hasan and Dr. Maducdoc.  Specifically, Claimant asserts:

> In the case at hand, the ALJ violated the treating physician rule in outright ignoring Dr. Hasan's opinions regarding Ms. Burns' mental residual functionality. Dr. Hasan is a board certified Psychiatrist who has treated Ms. Burns for the entire period of disability.   Dr. Hasan opined that Ms. Burns had serious limitations in her ability to: deal with the public; use judgment in a work setting; deal with work stresses; understand, remember and carry out detailed, but no complex job instructions; and behalf in an emotionally stable manner in a work setting. These opinions were formed by Dr. Hasan after hands-on treatment of Ms. Burns for over seventeen months.  Dr. Hasan's opinions are based upon his assessment of Ms. Burns and his professional knowledge regarding psychiatry. Moreover, on June 11, 2012 (after twenty seven months of continuous treatment), Dr. Hasan opined that Ms. Burns "continues to have significant symptoms to impair her ability to function daily, which impairs her ability to pursue any type of gainful employment for now and in the foreseeable future."

(ECF No. 14).

The ALJ is not required in all cases to give the treating physician's opinion greater

weight than other evidence in determining whether a claimant is disabled under the Act.

*Johnson v. Barnhart*, 434 F.3d 650, n. 5 (4th Cir. 2005).  The ALJ retains the duty to analyze

treating source opinions and judge whether they are well-supported by medically acceptable

evidence and consistent with other substantial evidence in the record.   20 C.F.R. §§

404.1527(c)(2) and 416.927.  If a medical opinion is not supported by relevant evidence or it is

inconsistent with the record as a whole, it will be accorded significantly less weight.  *See* 20

C.F.R. §§ 404.1527 (c)(3), (4) and 416.927; *Craig*, 76 F.3d at 590 ("[I]f a physician's opinion is

not supported by clinical evidence or if it is inconsistent with other substantial evidence, it

should be accorded significantly less weight.").

Moreover, a treating physician's opinion can never bind the ALJ on issues reserved to the ALJ, such as a claimant's RFC or whether a claimant is able to work. These decisions are solely the responsibility of the ALJ because they are administrative findings that are dispositive of a case; they are not medical issues. *See* 20 C.F.R. §§ 404.1527(d)(1)-(3) and 416.927; Social Security Ruling (SSR) 96-5p, 1996 WL 374183 at *2 (S.S.A.).

Claimant asserts that Dr. Maducdoc is in the best position to know the full scope of her physical condition. Claimant asserts that "Dr. Maducdoc has marshaled all of her medical care and is well aware of any residual functional limitations she possesses." Claimant argues that based upon their long-term physician-patient relationship, the ALJ should have given significant weight to Dr. Maducdoc's opinion that Claimant is relegated functionally to less than a full range of sedentary work.

Claimant asserts that the ALJ "outright ignored" Dr. Hasan's opinions regarding her mental RFC and that the ALJ was "merely looking for a reason to deny [Claimant] her benefits." There is no merit to this assertion. Dr. Hasan treated Claimant for anxiety and depression starting from May 2010 (ECF No. 22). The ALJ considered Dr. Hasan's medical source statement of August 9, 2011, as well as his letter of June 11, 2012 (Tr. at 25, 607-609, 972). ALJ discussed in his decision the treatment notes from Dr. Hasan from May 2010 through March 12, 2012 (Tr. at 22-23, 600-601, 604-605, 616-617, 829, 950-951, 968, 971). These treatment records showed that although Claimant still had anxious and/or depressed moods at times, her medications were relatively effective in controlling her symptoms (Tr. at 23, 600, 604-605, 616-617, 829, 968, 971). In most of the examinations, Claimant was appropriately groomed and cooperative, speech was of normal rate and volume, thought processes were goal directed, was alert and oriented times three, memory was intact, insight and judgment were good and there was

21

no evidence of hallucinations, delusions, suicidal or homicidal intent (Tr. at 600, 829, 950-951, 968). As the ALJ also noted, Claimant reported in August 2011 and February 2012 that she went on vacation in Florida and she even spent a few months there (Tr. at 950, 968). A recent treatment note from March 2012, Claimant denied having any mental problems (Tr. at 971). Such findings do not support the poor to fair abilities noted in Dr. Hasan's medical source statement nor do they support Dr. Hasan's statement that Claimant's psychiatric symptoms impaired her ability to pursue "any type of gainful employment" (Tr. at 607-608, 972). The ALJ held that he gave no weight Dr. Hasan's opinions because they were not supported by his own treatment records (Tr. at 25).[3]

Moreover, the ALJ did not find Claimant without any mental limitations (Tr. at 18). The ALJ recognized Claimant did not like crowds and limited her to only occasional interaction with the public. (*Id.*) The ALJ's finding that Claimant's mental impairments were not disabling, as opined by Dr. Hasan, was further supported by Ms. Gettman-Hughes' mental status examination findings, as well as supported by the opinion of the State agency psychological consultants, Drs. Allen and Saar (Tr. at 342-343, 370-372, 508). The ALJ held that "I give no weight to these opinions as they are not supported by Dr. Maducdoc's own treatment records and history as well as the record as a whole" (Tr. at 25).

Similarly, the ALJ appropriately assigned no weight to Dr. Maducdoc's August 2011, medical assessment to the extent that he opined that Claimant was limited to less than a full range of sedentary work (Tr. at 24-25, 591-594). The ALJ did not "arbitrarily discount" Dr.

---

[3] Dr. Hasan completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on August 9, 2011, which included his opinion that Claimant had a fair ability to follow work rules; relate to co-workers; interact with supervisor(s); understand, remember and carry out complex job instructions; and understand, remember and carry out simple job instructions. Less than a year later, by letter dated June 11, 2012, Dr. Hasan reported Claimant suffered from significant psychiatric symptoms that impair her ability to function daily or pursue any type of gainful employment for now and in the foreseeable future (Tr. at 25).

Maducdoc's findings.  The ALJ explained that he did not fully accept Dr. Maducdoc's opinion because it was inconsistent with Dr. Maducdoc's own treatment records and history, as well as the record as a whole (Tr. at 25).  The only reason given by Dr. Maducdoc for the assessed limitations, such as lifting no more than 10 pounds at a time, was "constant pain" in her low back (Tr. at 591-592).  However, as the ALJ noted, while the imaging studies resulted in a multitude of diagnoses, Claimant's alleged neck and low back pain was treated primarily with chiropractic therapy, physical therapy and muscle relaxers, but did not require surgery (Tr. at 23, 271-276, 280-300, 319-320, 379, 387, 539, 559, 832, 949, 965).  Moreover, the objective findings identified on many of the physical examinations of Claimant's back and neck did not support the extreme limitations alleged by Claimant (Tr. at 278-279, 320, 350-351, 388-389, 398-399, 957).  On several examinations, for example, Claimant generally had a normal gait, 5/5 motor strength in her upper and lower extremities, intact coordination, no atrophy and intact sensation to light touch.

In totality, the ALJ did not arbitrarily discount or outright ignore the opinions of Dr. Hasan and Dr. Maducdoc.  The ALJ evaluated their opinions in accordance with the regulations and case law and assigned them appropriate weight.

Residual Functional Capacity Assessment

The Court proposes that the presiding District Judge find that the ALJ's determination that Claimant possesses the residual functional capacity to perform light work is supported by substantial evidence.

SSR 96-8p states that

[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered

> with limitations or restrictions due to other impairments--be critical to the outcome of a claim.  For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 362207, *34477 (1996).

Claimant reports progressive low back pain (Tr. at 299).  She reported that she believes "deep squats" at the gym may be what caused her symptoms of neck and low back pain.  (*Id.*)

Listing 1.04 requires the following:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disk disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement  of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable  imaging, manifested by severe burning or  painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P., App. 1, § 1.04 (2013).

In his decision, the ALJ found that Claimant does not have an impairment or combination of impairments equal in severity to any listed impairment, as no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment.  The Court proposes that the presiding District Judge find that the ALJ adequately considered Claimant's non-severe impairments and Claimant's limitations in assessing her residual functional capacity.

24

The ALJ also pointed to several discrepancies and inconsistencies in the record that suggested that Claimant's neck and back pain was not as severe as she alleged (Tr. at 23-24). For example, the ALJ noted that Claimant went to Florida in August 2009, the same month that her alleged disability began, and then twice again in 2011, including one time going by car with her husband[4], where they purchased a home in Florida (Tr. at 62, 319, 950, 968). Also, in August 2010, Claimant reported that she was busy due to her work and school schedules. In October 2010, her daily routine consisted of sitting at a desk and doing her homework (Tr. at 344). And, as late as November 2010, Claimant reported that she was still a student at Mountain State University[5] (Tr. at 178, 278, 342, 390, 803). An MRI taken for Claimant's alleged neck and back pain revealed a thyroid mass (Tr. at 447). Dr. Maducdoc referred Claimant to Dr. Killmer for surgical evaluation of the abnormal thyroid mass. Subsequently, Claimant's thyroid was surgically removed in September 2010. The biopsy of the thyroid was benign. Claimant experienced "post-surgical hypothyroidism with poorly stabilized thyroid stimulating hormone levels" which was treated with Synthroid, a thyroid hormone. During a follow up visit, Claimant reported to feeling better.

The ALJ did not totally discount Dr. Maducdoc's opinion. The ALJ gave significant weight to part of Dr. Maducdoc's opinion, i.e., that Claimant had no sitting limitations, could perform postural activities occasionally and that she had had no manipulations because he found this part of the opinion consistent with the record (Tr. at 25). *See* SSR 96-5p, 1996 WL 374183, at *4 (explaining that "medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, . . . and that it may be necessary to

---

[4]  The car ride lasted approximately ten hours.

[5]  In conflict with the evidence stating Claimant was a student at Mountain State University, Dr. Sahloul's endocrinology consultation dated November 10, 2010, reports Claimant to be a student at Marshall University (Tr. at 803).

decide whether to adopt or not adopt each one."). As the ALJ explained, he did not dispute that Claimant had some limitations due to her impairments, but there was no reason why she could not function well in a competitive work environment that took into account her impairments (Tr. at 24).

In discussing Claimant's alleged carpal tunnel syndrome (CTS), the ALJ pointed out Claimant's sporadic assertions and symptoms. Claimant testified on June 13, 2012, that grasping small objects for a few seconds causes severe cramping. Claimant asserted that sitting with arms flat on a chair causes painful, tingling sensations and numbness from her elbows down to her fingertips (Tr. at 50). Claimant testified that she could not pick up loose change (Tr. at 51). In Claimant's self-completed Function Reports in connection to her disability application, dated July 28, 2010 and May 16, 2011, she did not select appropriate portions of the form to indicate problems with her hands (Tr. at 179-186, 228-235).

In this case, the medical evidence regarding carpal tunnel syndrome (CTS) was minimal. The ALJ recognized that an EMG and nerve conduction study in August 2010 showed bilateral carpal tunnel syndrome that could explain the alleged tingling in her hands (Tr. at 319-320). No specific treatment for CTS was suggested (Tr. at 320). The ALJ recognized that in November 2011, Dr. Patel opined that carpal tunnel syndrome needed to be ruled out (Tr. at 965).

Additionally the ALJ noted that Dr. Bhirud, who examined Claimant in October 2010, reported that there was no swelling or tenderness of her hands (Tr. at 15, 351). Claimant's joints and grip strength were also normal bilaterally and she was also able to pick up a coin from the floor (Tr. at 15, 351). Notably, even Dr. Maducdoc identified no manipulative limitations in his medical source statement and indicated that Claimant's ability to handle and use her fingers was "unlimited" (Tr. at 593).

26

The ALJ found Claimant credible to the extent she would experience increased pain with heavy lifting or prolonged periods of walking and/or standing.  The ALJ reduced the RFC to accommodate those limitations.  The ALJ held that "although the claimant's allegations of debilitating depression and anxiety with panic attacks were not fully consistent with the record, I accorded the claimant the benefit of the doubt and further reduced the [RFC] to incorporate limitations from the mental impairment.  However, I cannot find the claimant's allegations that she is incapable of all work activity to be credible because of significant inconsistencies in the record as a whole" (Tr. at 20).

The ALJ held that Claimant's degenerative disk disease failed to meet the criteria of section 1.04 in that there is no compromise of a nerve root or the spinal cord (Tr. at 17). Additionally, the ALJ stated there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation or motion of the spine, or motor loss accompanied by sensory or reflex loss and there is no positive straight-leg raising test.  The ALJ continued to point out there is no spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or appropriate medically acceptable imaging, manifested by severe burning or painful dysethesia, resulting in the need for changes in position or posture more than once every two hours.  The ALJ found that Claimant does not have lumbar spinal stenosis resulting in pseudoclaudication, established by finding appropriate medically acceptable imaging; manifested by chronic non-radicular pain and weakness; and resulting in an inability to ambulate effectively.

Credibility Determination

The ALJ must accompany his decision with sufficient explanation to allow a reviewing court to determine whether the Commissioner's decision is supported by substantial evidence. The Commissioner is required to include in the text of [his] decision a statement of the reasons

27

for that decision. *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ's "decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge. . . ." *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).

In the present matter, substantial evidence supports the ALJ's finding that Claimant's alleged severity of symptoms was not credible. Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms are not credible to the extent they are inconsistent with the ALJ's residual functional capacity assessment (Tr. at 32). The ALJ concluded that the information in Claimant's treatment records reflect poorly on her credibility (Tr. at 42).

The Fourth Circuit has held that an ALJ's credibility findings are "virtually unreviewable by this court on appeal." *Darvishian v. Green*, 404 F. App'x 822, 831 (4th Cir. 2010)(citing *Bieber v. Dept. of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002)); *Salyers v. Chater*, No. 96-2030, 1997 WL 71704, at *1 (4th Cir. Feb. 20, 1997) (unpublished) (an "ALJ's credibility findings… are entitled to substantial deference"). When evaluating a claimant's testimony, the ALJ first considers whether the claimant has one or more medically determinable impairments that could reasonably be expected to produce the symptoms alleged. *See* 20 C.F.R. §§ 404.1529(b) and 416.929. If such an impairment(s) exists, the ALJ then evaluates the intensity, persistence and limiting effects of the alleged symptoms arising from these impairments to determine the extent to which the alleged symptoms limit the claimant's ability to work. *See* 20 C.F.R. §§ 404.1529(c) and 416.929.

Substantial evidence supports the ALJ's finding that Claimant's alleged severity of symptoms was not credible. The ALJ held Claimant's statements concerning the intensity,

persistence and limiting effects of her symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment. The ALJ concluded that the objective findings do not support the limitations alleged by Claimant and reveal she is only partially credible regarding the severity of her complaints.

As the fact-finder, the ALJ has the exclusive responsibility for making credibility determinations. *See*, *Shively v. Heckler*, 739 F.2d 987, 989-990 (4th Cir. 1984) (stating that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight").

Claimant asserts that she stopped working in April 2009. Then, Claimant asserts onset of disability of August 2009. The ALJ points out that Claimant stopped working in April 2009 due to a business-related layoff rather than an alleged disability. Claimant did not undergo a thyroidectomy until September 2010. At the hearing, Claimant testified that she returned to work in 2010 in the coal mines. Claimant reported by letter dated October 4, 2011, that she was laid off from her employment on April 28, 2009, and received unemployment earnings thereafter. Evidence revealed that Claimant received unemployment compensation benefits in 2009 of $6,286.00 in the third quarter and $3,143.00 in the fourth quarter, as well as benefits in 2010 of $6,286.00 in the first quarter and $1,796.00 in the second quarter.[6] The ALJ pointed out that "In order to receive these, the claimant had to attest that she is ready, willing and able to work. This is inconsistent with her assertion that she is disabled and further erodes her credibility" (Tr. at 23-24).

20 C.F.R. §§ 404.1529(c)(3) and 416.929 states that "[w]e will consider all of the evidence presented, including information about your work record, your statements about your

---

[6] The ALJ held that Claimant worked after the alleged disability onset date, however, her earnings record shows that this work activity did not rise to the level of substantial gainful activity (Tr. at 14).

symptoms, evidence submitted by your treating, examining or consulting physician or psychologist, and observations by our employees and other persons."  Claimant's conflicting assertions of ability to work to receive unemployment compensatory benefits and inability to work to apply for social security disability was considered and discussed by the ALJ (Tr. at 23-24).

Vocational Expert

At the hearing, the ALJ asked a vocational expert whether jobs existed in the regional and national economy for a hypothetical individual with Claimant's age, education, work experience and residual functional capacity.  The vocational expert testified that given all of the factors the individual would be able to perform the requirements of representative occupations such as office helper, non-postal mail sorter and assembly worker (Tr. at 26-27, 64-72).

Claimant asserts that the ALJ presented an improper hypothetical to the vocational expert (VE) at the hearing because the ALJ did not include Claimant's alleged manipulative limitations. Claimant asserts:

> [T]he pertinent hypothetical question posed by the ALJ to the vocational expert, which the ALJ relied upon in denying benefits, failed to account for Dr. Maducdoc's opinion that Ms. Burns was limited to less than a full range of sedentary work. Once again, the ALJ arbitrarily utilized the cafeteria approach to accepting some, but rejecting other aspects of Dr. Maducdoc's opinions.  The ALJ broadly states that he does not accept Dr. Maducdoc's opinion that the claimant could only perform sedentary work as "it is inconsistent with Dr. Maducdoc's own treatment records and history as well as the record as a whole." Blanket statements such as the kind the ALJ has relied upon are not sufficient to support the rejection of a treating physician's opinions.   For the foregoing reasons, the decision of the Commissioner should be overturned.

While questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record.

*See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).  Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe.  *Benenate v. Schweiker*, 719 F.2d 291, 292 (8th Cir. 1983).

The Fourth Circuit has held, "We recognize that not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." *Grant v. Schweiker*, 699 F.2d 189 (4th Cir. 1983).  The proper inquiry under *Grant* is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable.

Claimant asked the VE to consider the hypothetical individual's ability to perform work if the individual had to be off task daily due to crying spells lasting 15 minutes, as well as off task up to three times a week due to bladder or bowel incontinence.  The VE testified that an employer will normally allow an individual to be off task no more than 15-20% of the time.  The ALJ ultimately rejected Claimant's proposed hypothetical as it was not supported by the objective evidence of record (Tr. at 27).

Contrary to Claimant's assertion, the ALJ in the present case posed a hypothetical question that included Claimant's abilities and limitations (Tr. at 60-63).  Ultimately, the ALJ found that Claimant's impairments do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Substantial evidence supports the determination of the ALJ.  The ALJ's decision reflects an adequate consideration of his impairments.  The ALJ appropriately weighed the psychological and medical opinions and the evidence of record in its entirety.  The ALJ appropriately relied on the evidence as a whole to determine that Claimant is able to perform jobs in existence in the nation and region.  Accordingly, the ALJ denied Claimant's application for SSI under the Social Security Act.

31

<u>Conclusion</u>

The Social Security Act defines disability as the inability to do any substantial gainful activity by reason of any medically determinable impairment, "which can be expected to result in death, or which has lasted or can be expected to last, for a continuation period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be found disabled, an individual must have a severe impairment that precludes her from performing not only her previous work, but also any other substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)(A) and § 1382c; 20 C.F.R. §§ 404.1505(a) and 416.912.  The claimant bears the ultimate burden of proving disability within the meaning of the Act.  *See* 42 U.S.C. § 423(d)(5)(A) and § 1382c; 20 C.F.R. §§ 404.1512(a) and 416.912.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner, DENY Plaintiff's Motion for Summary Judgment (ECF No. 13), and DISMISS this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Date:   February 2, 2015

Dwane L. Tinsley
United States Magistrate Judge